**United States District Court**
**District of New Jersey**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL COMPLAINT |
| v. | : | Hon. Joseph A. Dickson |
| JESSE WILLIAM KORFF | : | Magistrate No. 14-6529 (JAD) |

We, L. Martino and B. Zartman, the undersigned complainants being duly sworn, state the following is true and correct to the best of our respective knowledge and belief.

SEE ATTACHMENT A

We further state that we are Special Agents with the United States Department of Homeland Security, Homeland Security Investigations, and the Federal Bureau of Investigation, respectively, and that this complaint is based on the following facts:

SEE ATTACHMENT B

continued on the attached page and made a part hereof.

_____
L. Martino, Special Agent
Department of Homeland Security
Homeland Security Investigations

_____
B. Zartman, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

January 17, 2014                             at     Newark, New Jersey
Date                                                           City and State

Honorable Joseph A. Dickson
United States Magistrate Judge                  _____
Name & Title of Judicial Officer                 Signature of Judicial Officer

1

# ATTACHMENT A

## Count One

### Possession and Transfer of a Toxin for Use as a Weapon

Between in or about November 2013, through on or about January 15, 2014, in Essex County, in the District of New Jersey and elsewhere, defendant JESSE WILLIAM KORFF knowingly developed, produced, stockpiled, transferred, acquired, retained, and possessed a toxin, as defined by Title 18, United States Code, Section 178(2), to wit, abrin, for use as a weapon, and attempted to do the same, in violation of Title 18, United States Code, Section 175(a).

## Count Two

### Smuggling Goods from the United States

On or about January 15, 2014, in Essex County, in the District of New Jersey and elsewhere, defendant JESSE WILLIAM KORFF did fraudulently and knowingly export and send from the United States, and attempt to export and send from the United States, merchandise, articles, and objects, including a toxin, as defined by Title 18, United States Code 178(2), to wit, abrin, the possession and transfer of which is prohibited under Title 18, United States Code, Section 175(a), and did receive, conceal, buy, sell, and in any manner facilitate the transportation, concealment, and sale of such merchandise, articles, and objects, prior to exportation, knowing the same to be intended for exportation, in violation of Title 18, United States Code, Section 554(a).

1

## ATTACHMENT B

We, L. Martino and B. Zartman, are Special Agents with the United States Department of Homeland Security, Homeland Security Investigations, Newark ("HSI"), and the Federal Bureau of Investigation, Newark Division ("FBI"), respectively. This application arises from a joint investigation by HSI and FBI of the clandestine production, transfer and export of toxins and controlled substances. We have personally participated in this investigation and are aware of the facts contained herein based on our own respective investigations, as well as our respective review of documents, records and information provided to us by other law enforcement officers and technical experts. The other law enforcement officers and technical experts we have received information from include FBI special agents with training and experience in investigations involving weapons of mass destruction ("WMD"). Based on our respective personal knowledge, and the information we have received from the law enforcement officers and technical experts described above, we both have knowledge, training, and experience regarding the production, deployment, and weaponization of WMDs. Specifically, we are both familiar with toxins, including abrin, and their chemical properties, methods of production, how they can be weaponized, and their effects on the human body. Since this Affidavit is submitted for the sole purpose of establishing probable cause to support the issuance of a complaint and arrest warrant, we have not necessarily included each and every fact known by the government concerning this investigation. Where statements of others are related herein, they are related in substance and in part. Where we assert that an event took place on a particular date, we are asserting that it took place on or about the day alleged.

A. <u>Summary of Investigation</u>

1. HSI and FBI have conducted a joint investigation of the illicit, online sale of lethal toxins, as well as certain chemicals, materials and equipment related to the production of lethal toxins and controlled substances. As set forth below, the investigation has revealed that JESSE WILLIAM KORFF ("KORFF") has utilized an anonymous, Internet-based marketplace known as "Black Market Reloaded" ("BMR") to facilitate the unlawful sale of lethal toxins to prospective purchasers.

B. <u>Black Market Reloaded and the Tor Network</u>

2. Beginning in or about April 2013, HSI initiated an investigation of illicit sales activity on BMR. The investigation revealed that the BMR website provides a sales platform that enables vendors and buyers who are users of the site to conduct anonymous transactions online involving the sale of a variety of illegal and harmful goods, including but not limited to biological agents, toxins, chemicals, firearms, ammunition, explosives, controlled substances, and counterfeit goods.

3. The basic user interface of BMR resembles those of other well-known online marketplaces, such as ebay and Amazon.com. However, unlike mainstream

2

e-commerce websites, BMR is only accessible on the "Tor network," as further described herein.

4. Every computer device on the Internet has an Internet protocol or "IP" address assigned to it, which is used to route Internet traffic to and from the device. Ordinarily, a device's IP address can be used to determine its physical location and, thereby, its user. The Tor network, however, enables its users to hide their identities, as well as their physical locations.

5. In essence, the Tor is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true IP addresses of the computers on the network and, thereby, the identities of the network's users.

6. Although Tor has known legitimate uses, it is also known to be used by cybercriminals seeking anonymity in their illicit online activities. Every communication sent through Tor is transferred through numerous relays within the network, and concealed in numerous layers of encryption, such that its users believe that it is virtually impossible to trace the communication back to its true, originating IP address.

7. Similarly, Tor enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, thereby making it extremely difficult to identify the server's physical location.

8. Illicit websites operating on Tor have complex web addresses, generated by a computer algorithm, ending in ".onion." Websites with ".onion" addresses can be accessed only by using Tor browser software, which may be downloaded by prospective users from the Internet.

9. At all times relevant to HSI's investigation of this matter, BMR maintained a ".onion" web address on the Tor network.

C. The Bitcoin Payment System

10. The primary form of payment used on the BMR website is a form of digital currency known as Bitcoins. Bitcoins are a decentralized form of electronic currency, existing entirely on the Internet and not in any physical form. The currency is not issued by any government, bank, or company, but rather is generated and controlled automatically through computer software operating on a "peer to peer" network. Bitcoin transactions are processed collectively by the computers composing the network.

11. While Bitcoins have known legitimate uses, they are known to be utilized by cyber-criminals given the ease with which they can be used to move money in relative anonymity.

3

12. Generally, in order to acquire Bitcoins, a user must purchase them from a Bitcoin "exchanger." In return for a commission, Bitcoin exchangers accept payments of currency in some conventional form (cash, wire transfer, etc.) and exchange the money for a corresponding number of Bitcoins, based on a fluctuating exchange rate. Exchangers also accept payments of Bitcoin and exchange the Bitcoins back for conventional currency, again, charging a commission for the service.

13. Once a user acquires Bitcoins from an exchanger, the Bitcoins are kept in a virtual "wallet" associated with a Bitcoin "address," designated by a complex string of letters and numbers. The "address" is analogous to the account number for a bank account, while the "wallet" is analogous to a bank safe where the money in the account is physically located. Once a Bitcoin user funds his wallet, the user can then use Bitcoins in the wallet to conduct financial transactions, by transferring Bitcoins from his Bitcoin address to the Bitcoin address of another user, over the Internet.

14. BMR's payment system essentially consists of a Bitcoin "bank" internal to the website, where BMR users must hold an account in order to conduct transactions on the site.

15. In order to post listings on the BMR site, a vendor must first establish a seller's profile. In order to make a purchase from a vendor on the site, a user must establish an account on BMR, and then transfer his Bitcoins to a Bitcoin address associated with the user's BMR account.

16. After funding one's account, the user can then make purchases from BMR vendors. When the user purchases an item on BMR, the Bitcoins needed for the purchase are held in escrow in a virtual wallet maintained by BMR pending completion of the transaction.

17. Alternatively, at their discretion, transactions by and between users and vendors which were initiated on BMR can also be facilitated through other means, including the use of non-BMR based, virtual Bitcoin wallets, as well as by traditional means, including postal money orders and Western Union money transfers.

D. Abrin

18. Abrin is a toxin as defined in 18 U.S.C. § 178(2) and is listed as a select agent by the United States Department of Health and Human Services.[1] See 42 C.F.R. § 73.3. Abrin occurs naturally in the seeds of the rosary pea plant (*abrus precatorius*). Abrin can also be extracted from the seed. The extraction of the abrin from the seeds is relatively easy and does not require technical expertise.

---

[1] Select agents and toxins are a subset of biological agents and toxins that the Departments of Health and Human Services ("HHS") and Agriculture ("USDA") have determined to have the potential to pose a severe threat to public health and safety, to animal or plant health, or to animal or plant products.

Procedures and methods for extracting the abrin are available from open sources on the Internet.

19. Small doses of abrin are potentially lethal to human beings if ingested, inhaled, or injected. Symptoms from poisoning from abrin can include difficulty breathing, nausea, vomiting, and diarrhea, with possible death within 36 to 72 hours. According to information posted by the Centers for Disease Control and Prevention on its website, there is no antidote for poisoning from abrin.

20. Dispersal of abrin may be accomplished through a number of means and devices. One such method that could be used is to place a liquid containing abrin into a food or drink substance for ingestion by an unsuspecting target.

E. <u>KORFF'S Illicit Conduct</u>

21. Upon gaining access to the BMR site, HSI identified numerous offerings for the sale of illegal and harmful goods, including but not limited to biological agents, toxins, firearms, ammunition, explosives, controlled substances, counterfeit goods, and fraudulent documents. As further detailed herein, from in or about June 2013, through in or about December 2013, KORFF maintained a seller's profile on BMR which he utilized to advertise the sale of illicit goods.

22. In connection with the investigation, an HSI undercover agent in Newark, New Jersey (the "UC") accessed the BMR site on the Tor network and established a user account. In or about November 2013, the UC identified a posting on a seller's profile page (under an alias screen name later identified as KORFF) that advertised the sale of illicit goods.

23. On November 13, 2013, the UC sent an initial, private message to KORFF on the BMR site to inquire about a listing on KORFF's BMR seller's profile page. Subsequently, between November 13, 2013, and on or about January 15, 2014, the UC and KORFF engaged in online negotiations for the purchase of a toxin, ultimately concluding in a transaction whereby KORFF agreed to sell two liquid doses of abrin to the UC for the total purchase price of $2,500 (U.S.), which doses were intended to be transported from Florida, through New Jersey, en route to a destination outside the United States. Those communications are further detailed below.

24. On November 13, 2013, the UC sent a message to KORFF via BMR's private-messaging system to inquire about obtaining a sample of a toxin that had been offered by KORFF on his BMR listing page. In response, KORFF stated that he would not supply a sample, but that he had received "positive feedback" on BMR for his prior sales history, meaning that the toxin offered by KORFF would be effective and delivered as-advertised.

5

25. On November 15, 2013, the UC sent a private message to KORFF to inquire about KORFF's shipping method, as well as the dosage of toxin contained in each order. In response, KORFF sent a message to the UC on a separate online, secure messaging service. KORFF's message stated, in part, "[T]he oral dose would be 150mg of abrin that is enough for a 330 pound target," meaning that the quantity of abrin contained in each dose would be sufficient to kill an intended victim weighing up to 330 pounds.

26. On December 20, 2013, KORFF sent a message to the UC that stated, in part, "did you want the oral version and how many...I will give you a bit coin address and once I receive I will send it immediately I already have it made...they are 2000 each unless you buy more than [sic] we can talk discounts." Law enforcement has interpreted this message to mean that KORFF had prepared quantities of abrin to be administered through oral (ingestion) means, and that each dose would cost $2,000 (U.S.). Additionally, KORFF's message included a Bitcoin address so that the UC could transfer the equivalent of $2,000 (U.S.) in Bitcoin to KORFF for each ordered dosage of abrin. In response, the UC requested information on the required dosage necessary to use on an individual weighing 200 pounds.

27. On December 23, 2013, KORFF sent a message to the UC that stated, in part, "[I]t is not a pill it comes in a liquid to put in a drink or in food like the bun of a cheeseburger," meaning that each dose of abrin sold by KORFF would be prepared in liquid form, which could then be injected or poured into a digestible substance for ingestion by an unsuspecting victim. In a follow-up message to the UC dated December 25, 2013, KORFF stated, in part, "[T]he state is Florida and the city will be [F]ort Meyers [sic]," meaning that KORFF agreed to deliver a quantity of abrin to the UC at a pre-determined location at or near Fort Myers, Florida.

28. On December 27, 2013, KORFF sent a message to the UC which stated, in part, that "I put it in a candle by carving a hole and putting the glass vial that contains the liquid in the hole and then I melt the wax I dug out and pour it over the vial and make a flat surface in the top so it looks like a regular candle. [T]here are really no precautions to take when handling the candle, even if you dropped the candle the vial inside would not break because it is encased in wax and because the vials are very tough...when you handle the abrin itself you should were [sic] gloves...each vial contains ...about 220mg of abrin enough to kill a 440 pound human...it is as simple as pouring it in a drink or sandwich bun, yes the drink should be somewhat dark because this is about the color of light rum or whiskey, and I suggest either a coke or a shot of rum or whiskey actually alcohol would probably be the best because you know they will drink all of it and they will start to feel flu like symptoms in 48 hours then it will progressively get worse until they die by the forth [sic] day." Law enforcement has interpreted this statement to mean that KORFF secrets vials containing liquid doses of abrin inside candles in order to avoid detection by law enforcement. Additionally, KORFF instructed the UC that each dose of abrin sold

by KORFF could kill an individual weighing up to 440 pounds, and that the dosage could be discretely injected or poured into an unsuspecting individual's food or drink in order to ensure ingestion of the poison.

29. On December 31, 2013, the UC sent a message to KORFF. The UC agreed to supply a deposit of the equivalent of $1,500 (U.S.) in Bitcoin to KORFF, in exchange for one dose of abrin. In addition, the UC asked KORFF what the death of his intended victim would look like to a doctor, and whether the cause of death would be considered suspicious. In response, KORFF sent a message to the UC dated January 1, 2014. That message stated, in part, that "[D]eath will look like a really bad case of the flu they will start to show symptoms within 48 hours and be hospitalized by 72 and be dead shortly thereafter and no doctor will suspect foul play so there will most likely be no autopsy but if there is nothing will show up." Law enforcement has interpreted this statement to mean that KORFF confirmed the UC's use of the abrin would kill his intended target without raising the suspicion of law enforcement.

30. On January 5, 2014, KORFF sent a message to the UC which stated, in part, "[T]he…location is exit 139 lucket rd on I75 there is a …stop there," meaning that KORFF had selected a location for the anticipated transfer of the abrin. Law enforcement subsequently confirmed the location of the North/South bound, Exit 139 at Luckett Road, which is located approximately 10 miles from Fort Myers, Florida (the "Rest Stop"). Additionally, KORFF's message contained a Bitcoin address[2] so that the UC could provide the requested $1,500 (U.S.) deposit. Further, KORFF's message stated, "I am really hoping you are not wasting my time…you don't know how many assholes ask me a hundred questions and then don't reply to my emails," meaning that KORFF wanted confirmation from the UC that he intended to finalize the contemplated transaction.

31. On January 6, 2014, the UC utilized funds maintained in a New Jersey based bank account to facilitate the purchase of the equivalent of $1,500 (U.S.) in Bitcoin (then calculated as 1.608 Bitcoin). Through an online Bitcoin exchange company, the UC then directed the payment of 1.608 Bitcoin to the Bitcoin address provided by KORFF, as a deposit for the purchase of one liquid dose of abrin. Later that day, the UC contacted KORFF to confirm payment of the Bitcoin, and to apologize for not responding sooner to KORFF's recent messages. Specifically, the UC stated, in part, "I'm very sorry I haven't gotten back to you over the last few days, [b]ut we got blasted up here in Canada and the snow/ice storm took my internet out," thereby indicating to KORFF that the UC was located in Canada.

32. On January 6, 2014, KORFF sent a message to the UC that stated, in part, "I will go there today and find some were [sic] good to hide it like a bush and I will send

---

[2] The Bitcoin address provided by KORFF was not affiliated with BMR, presumably due to the fact the BMR website has been inaccessible on the Tor network since on or about December 23, 2013.

you a photo...I just got the coins...just let me know when and I will be ready," meaning that KORFF confirmed his receipt of the $1,500 (U.S.) deposit, as well as his intention to provide the UC with a photograph of the exact spot for the planned transfer of the abrin.

33. In a series of online communications between January 13, 2014, and January 15, 2014, KORFF and the UC discussed, among other issues, the effectiveness of the abrin on its intended target, the sale of an additional quantity of abrin, and the precise date, time, and location of the abrin transfer. Those conversations are more fully described below.

34. On January 13, 2014, the UC sent KORFF a message which stated, in part, "I need to take care of my problem next week if possible...I just want to confirm that this will not be traced back to me...you were saying that if I dropped the abrin in the dude's drink on a Monday that he'd be dead by Friday...if they do medical tests looking for the cause of death, there's no way they will find any trace of abrin...[e]ven if they did, the alcohol would be gone from his system and there would be no way to tie the drink to the poisoning, correct?" In response, by message sent on January 13, 2014, KORFF stated, in part, "I guarantee it will work...if you drop the abrin in someone's drink Wednesday he will be dead Friday and there is no way to trace it after 24 hours of ingestion," meaning that KORFF confirmed the UC would be able to use the abrin to poison and kill an unsuspecting individual without being detected by law enforcement.

35. In addition, KORFF's January 13, 2014, message stated "[I]f you would like a good deal if you can send 1000 or send the 500 and then the other 500 when you can get it I will give you 2 doses instead of 1 ... that way you get the second dose for 500," meaning that KORFF offered to sell a second dose of abrin to the UC for an additional $500 (U.S.). In response, the UC sent a message to KORFF to confirm his acceptance of the offer to purchase a second dose of abrin for an additional cost of $500 (U.S.), resulting in a total purchase price of $2,500 (U.S.) for two doses of abrin. Additionally, the UC stated, in part, "[Y]ou leave me the 2 doses and I'll ...put $500 in US dollars at the same ... location...[i]f ...on the road heading north by late afternoon Wednesday...should be in New Jersey...by late Thursday and then in Ontario by late Friday...[i]f I were to get the doses in Canada by Friday that would actually be much better timing for me anyway," thereby indicating to KORFF that the UC would be prepared to retrieve the abrin doses from the hidden location selected by KORFF on January 15, 2014. Additionally, the UC's message indicated that a payment of $500 (U.S.) would be made toward the total purchase price, and that the abrin would be transported from Florida through New Jersey en route to Canada.

36. On January 14, 2014, KORFF sent a message to the UC that stated, in part, "I am going to pull through on this...I can always make more but I do have several more doses on hand...I am heading up there now...I will send pics soon," meaning that

8

KORFF intended to finalize the pending transaction with the UC, and that KORFF intended to travel to the Rest Stop to take a picture of the location where he planned to place the abrin for retrieval by the UC.

F. KORFF's Delivery of Abrin

37. On January 14, 2013, at approximately 2:30 p.m., law enforcement agents assigned to conduct physical surveillance of the Rest Stop observed a four door, taupe-colored, 1991 Buick Park Avenue sedan, with a Florida license plate (the "Buick"), which contained two occupants. Agents observed the vehicle as it parked at the rear portion of Hamilton Drive, which is a dead-end street in close proximity to the Rest Stop parking lot. Agents further witnessed a Caucasian male, subsequently identified through law enforcement and Florida Department of Motor Vehicles ("DMV") databases as KORFF, as he exited the vehicle. Agents watched KORFF as he stood in front of, and visually inspected, specific areas of landscape next to the road. KORFF then re-entered the vehicle, which departed the location. A further review of DMV records has revealed that the Buick is registered to KORFF.

38. On January 14, 2014, at approximately 11:09 p.m., the UC received a message from KORFF. The message contained photographs of a particular section of terrain on Hamilton Drive, including a "NO TRESPASSING" sign, a palmetto bush and other ground cover (the "Photos"). The Photos accurately depict the Hamilton Drive area that surveillance agents observed earlier that afternoon. Furthermore, KORFF's message stated, in part, that "[T]here is photo of the sign of whamilton [sic] and after he gets to the end of whamilton [sic] on the left is a chained of [sic] area there is a photo of the address and on the right of that post is another with a palmetto right by it and a no trespassing sign at the base of it that is covered by the palmetto I will place it behind the sign in a McDonalds bag there will be two candles each with a brown vial filled with a brown liquid that is the oral dose of abrin," meaning that KORFF had provided the UC with a description of the proposed transaction site (the "Delivery Location"), and that KORFF intended to put the candles containing the abrin inside a bag obtained from a McDonald's restaurant.

39. Based on prior communications between KORFF and the UC, as well as the physical identification of KORFF on January 14, 2014, law enforcement established surveillance at a residence believed to be occupied by KORFF in Labelle, Florida (the "Labelle Residence"). Agents also established surveillance at the Delivery Location in preparation for KORFF's delivery of the abrin.

40. On January 15, 2014, at approximately 1:00 p.m., while under the surveillance of law enforcement officials, KORFF exited the Labelle Residence and entered the Buick. The Buick proceeded in the direction of the Delivery Location, whereupon it stopped at a nearby McDonald's restaurant. Agents continued to observe

KORFF as he exited the Buick while carrying a black, rectangular shaped, laptop-style bag, and as he entered the McDonald's. At or about the same time KORFF was observed by surveillance agents inside the restaurant, the UC received a message from KORFF. KORFF's message stated, in part, that "[I]'m on my way."

41. Subsequently, at approximately 1:20 p.m. on January 15, 2014, agents observed KORFF exit the McDonald's while carrying the same black, rectangular shaped, laptop-style bag, as well as an additional bag which was later identified as a McDonald's food bag. KORFF entered the Buick, which then departed the restaurant location and proceeded to the Delivery Location. After the Buick arrived at the Delivery Location, KORFF was observed as he exited the Buick while in possession of a McDonald's bag. Agents then watched as KORFF placed the McDonald's bag in the same location depicted in the Photos, and re-entered the Buick. The Buick then drove away from the Delivery Location, toward a nearby parking lot in the vicinity of the Rest Stop.

42. On January 15, 2014, at approximately 2:10 p.m., an FBI undercover agent ("UC-2") arrived at the Delivery Location. UC-2 retrieved a McDonald's bag containing two wax candles from the location depicted in the Photos. UC-2 left a package containing $500 (U.S.) in the same location, and then returned to his vehicle and departed the area.

43. Approximately five minutes after UC-2 departed the area, agents observed as the Buick returned to the Delivery Location. KORFF exited the Buick and retrieved the package left by UC-2, which contained a payment in the amount of $500 (U.S.). KORFF then re-entered the Buick and departed the area.

G. <u>Laboratory Analysis of the Suspected Toxin</u>

44. The candles were subsequently examined and found to contain vials of liquid. Samples of the liquid contained in the vials were analyzed and found to contain a detectable amount of abrin.